[No. 31878-4-II. Division Two. November 8, 2005.]

SHANNON W. SUMMERS, *Appellant*, v. GREAT SOUTHERN LIFE INSURANCE COMPANY, *Respondent*.

*Matthew B. Edwards* (of *Owens Davies, P.S.*), for appellant.

*John P. Mele*, for respondent.

¶1 QUINN-BRINTNALL, C.J. — The Federal Aviation Administration (FAA) revoked Shannon Summers's medical certificate for approximately 21 months, thereby making him ineligible to perform his duties as a commercial airline pilot. Summers sought coverage under an insurance policy which provided benefits in the event of a permanent and continuous disability. After the insurer, Great Southern Life Insurance Co. (Great Southern), denied coverage, Summers sued. The superior court granted Great Southern's motion for summary judgment, concluding that Summers had not satisfied the permanency requirements of the insurance policy. We affirm.

## FACTS

¶2 Summers is a commercial airline pilot. Commercial pilots are required to maintain a medical certificate issued by the FAA. 14 C.F.R. § 61.3(c). One of the requirements for a medical certificate is that the individual have "[n]o established medical history or clinical diagnosis" of "[a] disturbance of consciousness without satisfactory medical explanation of the cause." 14 C.F.R. § 67.109(a)(2).

¶3 After Summers lost consciousness while skydiving in July 2000, the FAA revoked his medical certificate. Summers's physician submitted a report to the FAA, opining that Summers's loss of consciousness was likely due, not to a medical condition, but to being hit in the face with a parachute buckle. Summers moved for reconsideration of the FAA decision, which was denied in March 2001. The

FAA recommended that Summers remain in a recovery period until July 2002, at which time he was encouraged to reapply. The FAA informed Summers that he could seek reconsideration if he had "significant medical evidence to offer." 2 Clerk's Papers (CP) at 289.

¶4 Following the FAA's revocation, Summers filed for benefits under an Airline Pilots Occupational Disability policy he purchased through Great Southern.[1] The policy awarded a lump sum payment of $250,000 in the event that Summers became "continuously Disabled and complied with all Benefit Conditions for at least the Waiting Period [and] has survived the waiting period." 1 CP at 86. The "waiting perid" was 12 months and the policy defined "disability" or "disabled" as "the permanent inability to perform the material duties of a commercial pilot as the result of any sickness, or accidental bodily injury." 1 CP at 86. The policy went on to state: "Permanency is a necessary requirement and recovery must not be reasonably expected based upon accepted medical standards." 1 CP at 86.

¶5 A Great Southern medical consultant, who was formerly responsible for the FAA's issuing and revoking of medical certificates, reviewed Summers's records and concluded that Summers's medical certificate would likely be reissued after 12 to 24 months had passed from the date of the skydiving incident. Great Southern then sent a letter to Summers explaining the denial of coverage and stating that Summers's policy "requires his medical condition to permanently prevent him from performing his duties." 1 CP at 115.

¶6 In response, Summers submitted a report from his treating physician in which the physician concluded that while Summers would likely be cleared to fly by the FAA in a "few more months," he was currently "totally disabled." 1

---

[1] The policy purchased by Summers is actually marketed and "sold" by another company. As that company is not a qualified insurer, it has such policies underwritten and issued by Great Southern. For the sake of clarity, we refer solely to Great Southern.

CP at 76. Two physicians who would examine Summers during ensuing arbitration proceedings also concluded that Summers's medical certificate would likely be reissued.

¶7 In April 2002, after Summers submitted these medical reports to the FAA, his medical certificate was reissued. Great Southern then denied Summers's renewed request for coverage, stating that because his medical certificate was reissued, his injury was "neither lasting nor non-remediable" and thus, could not be "permanent" within the meaning of the policy. 2 CP at 295.

¶8 Summers sued Great Southern for breach of contract. On cross-motions for summary judgment, the superior court granted Great Southern's motion, concluding that the term "permanent" was unambiguous and required Summers to show more than just a temporary inability to perform as a commercial pilot. This appeal followed.

## ANALYSIS

¶9 This appeal requires that we interpret the provisions of Great Southern's disability insurance policy. The interpretation of an insurance policy is a question of law that we review de novo. *Butzberger v. Foster*, 151 Wn.2d 396, 401, 89 P.3d 689 (2004). An insurance policy is construed as a whole, with the policy being given a fair, reasonable, and sensible construction. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000). But if the policy is clear and unambiguous, we must enforce it as written and may not modify it or create ambiguity where none exists. *Weyerhaeuser Co.*, 142 Wn.2d at 666. A policy clause is ambiguous when, on its face, it is fairly susceptible to two different but reasonable interpretations. *Weyerhaeuser*, 142 Wn.2d at 666. An interpretation is not reasonable if it leads to a strained construction or fails to give meaning to every term in a policy provision. *Allstate Ins. Co. v. Hammonds*, 72 Wn. App. 664, 667-68, 865 P.2d 560, *review denied*, 124 Wn.2d 1010 (1994). Where

an ambiguity does exist, the policy must be construed in favor of the insured. *Weyerhaeuser Co.*, 142 Wn.2d at 666.

¶10 It is undisputed that the FAA's revocation of Summers's medical certificate rendered Summers ineligible to perform the material duties of a commercial pilot. What is disputed is whether this ineligibility was "permanent" within the meaning set forth in Great Southern's policy. Summers maintains that the term "permanent" is inherently ambiguous and must therefore be construed in his favor to provide coverage. Alternatively, he maintains that the $250,000 policy award is intended to offset 30 months of his salary should he be unable to work as a commercial pilot during such period. Summers contends that this asserted purpose renders the term "permanent" ambiguous, and thus, the term should be construed to mean "having continuously existed for the twelve month waiting period, with no reason to expect a change for the remaining eighteen months for which the policy provides a replacement benefit." Br. of Appellant at 23. Summers's arguments are not persuasive.[2]

¶11 Great Southern's policy is similar to that addressed in *Richards v. Metropolitan Life Insurance Co.*, 184 Wash. 595, 55 P.2d 1067 (1935). There, the policy provided benefits if Richards " 'bec[a]me totally and permanently disabled . . . so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit, and that such disability has already continued

_____

[2] As to Summers's second argument, we note even under the policy interpretation he advances, summary judgment was proper for Great Southern. Assuming that Summers was unable to work immediately after the skydiving incident, his policy interpretation required him to show (1) that he was unable to work through July 2001, and (2) that as of July 2001, there was no reason to expect that his medical certificate would be reissued before the end of 2003. As of July 2001, Summers had two letters from the FAA recommending that he remain in a waiting period until July 2002, at which time he was encouraged to reapply. Summers also had Great Southern's conclusion that the FAA would likely reissue his medical certificate no later than July 2002. The FAA's letters and Great Southern's medical conclusion provided a reasonable expectation that Summers's medical certificate would be reissued before the end of 2003.

uninterruptedly for a period of at least three months.' "
*Richards*, 184 Wash. at 596-97 (emphasis omitted).
Richards was totally disabled for three years before return-
ing to work. He argued that he was entitled to coverage and
that the insurance policy should be interpreted to require
total and permanent disability for only the specified three-
month period. In rejecting the insured's position, the court
stated:

> So far as this action is concerned, the vital word in the policy
> is "permanent." That word is not a technical one, but a
> common, ordinary word with a well-recognized meaning, even
> to the lay mind . . . :
>
> "Continuing or enduring in the same state, status, place, or
> the like, without fundamental or marked change; not subject to
> fluctuation or alteration; fixed or intended to be fixed; lasting;
> abiding; stable; not temporary or transient."
>
> . . . .
>
> The words "permanent" and "temporary" are antonyms of
> each other and readily occur to the ordinary mind as such. A
> disability that is transient or temporary cannot be a permanent
> one. It is reasonable and proper to say that one has been
> "totally disabled" for a definite period of time, but it would do
> violence to the language, and would be utterly contradictory, to
> speak of a "permanent disability" as being for a limited period.
> To give the word "permanent" the meaning of "temporary,"
> would be to delete the word "permanent" from the contract
> entirely.
>
> The concluding words of that paragraph in the supplemental
> agreement in which the word "permanently" is used contain a
> further restriction or condition. They provide that such disabil-
> ity, referring to permanent disability, must already have con-
> tinued uninterruptedly for a period of at least three months
> before the company shall be called upon to waive further
> payment of premium or to pay the monthly income. A testing or
> waiting period, sometimes designated as a moratorium, is thus
> prescribed, during which the company is relieved of the neces-
> sity of investigating premature or immature claims. . . .
>
> . . . . If, at the end of the waiting period, it appears with
> reasonable certainty that the insured is permanently disabled,

he is then entitled to payment of the installments provided in the contract.

*Richards*, 184 Wash. at 602-03 (emphasis omitted) (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 1824 (2d ed. 1934)).

¶12 Likewise, as used in the policy at issue here, "permanent" is a term of common understanding; it is not ambiguous. Under the definition put forth in *Richards* and other cases,[3] "permanent" refers to "a state of indefinite continuance, ... something incapable of alteration, fixed, or immutable." 1C JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 641, at 206 (1981). Under this definition, "it must appear that the disability will probably continue for the remainder of the insured's life." APPLEMAN, *supra*, § 641, at 206; *see also* BLACK'S LAW DICTIONARY 1139 (6th ed. 1990) (defining "permanent disability" as "one which will remain substantially the same during remainder of worker's compensation claimant's life. ... Within insurance policies, does not mean that disability must continue throughout life of the insured, but it connotes idea that disability must be something more than temporary, and at least presumably permanent."). Here, there was no evidence that Summers's disability would continue for the remainder of his life, thus, there was no evidence that he was permanently disabled.

¶13 Summers also argues that "permanent" requires only an inability to work for 12 months with no reasonable expectation of returning to work within the next 18 months.[4] Courts have held that where an insurance policy

---

[3] *Hiatt v. Dep't of Labor & Indus.*, 48 Wn.2d 843, 846, 297 P.2d 244 (1956); *Williams v. Va. Mason Med. Ctr.*, 75 Wn. App. 582, 586-87, 880 P.2d 539 (1994); *Shea v. Dep't of Labor & Indus.*, 12 Wn. App. 410, 415, 529 P.2d 1131 (1974), *review denied*, 85 Wn.2d 1009 (1975).

[4] Summers asserts that this interpretation is correct because it is one which Great Southern has used in other cases. The record contains several memos from Great Southern that discuss claims by other individuals with Airline Pilots Occupational Disability policies. But because the language of Summers's policy is unambiguous, we decline to consider extrinsic evidence. *Berg v. Hudesman*, 115 Wn.2d 657, 670, 801 P.2d 222 (1990).

Moreover, these memos do not define "permanent" disability in the way Summers would have the policy read and the claims involved are distinguishable

contemplates an end to an insured's disability,[5] or that the condition will be presumed permanent upon the expiration of a certain time period,[6] "permanent" does not always mean "permanent, unalterable, or unchanging, nor does it mean that the disability must absolutely continue for the duration of the insured's life." APPLEMAN, *supra*, § 641, at 202. But the policy here does not contain language suggesting that Summers's permanent disability need not be permanent, unalterable, or unchangeable. To the contrary, the Great Southern policy contains strongly worded language defining "disability" as "the permanent inability to perform" and also stating that "[p]ermanency is a necessary requirement and recovery must not be reasonably expected based upon accepted medical standards." 1 CP at 86. If Great Southern's policy was intended to provide a 30-month salary replacement to an insured who was unable to work for 30 months, there would be no need for the term

---

from Summers's claim. With respect to four of the memos, two involved insureds with degenerative diseases, one involved an insured with a history of seizures who would not be reconsidered by the FAA for five years, and one involved an insured who had suffered repeated loss of consciousness episodes and had been repeatedly denied reinstatement of his medical certificate by the FAA. Also many of the memos in the record contain language contradicting Summers's argument: "unlikely that pilot will return to work due to unpredictable frequency of occurrences"; insured not entitled to coverage because "[b]oth Dr's. say he should eventually be able to [return to work]"; "[t]he FAA will not recertify this pilot with this condition." 2 CP at 307-09.

[5] *Boyarsky v. Travelers Ins. Co.*, 85 F. Supp. 204, 206 (S.D.N.Y. 1948); *Wallace v. Bhd. of Locomotive Firemen & Enginemen*, 230 Iowa 1127, 1130, 300 N.W. 322 (1941); *Metro. Life Ins. Co. v. Fisher*, 1962 OK 260, 382 P.2d 434, 438-40.

[6] *Franklin Life Ins. Co. v. Burgess*, 219 Ark. 834, 839, 245 S.W.2d 210 (1952); *Yoffa v. Metro. Life Ins. Co.*, 304 Mass. 110, 111-12, 23 N.E.2d 108 (1939). *But see Richards*, 184 Wash. at 605-06:

[T]here are a number of cases from other jurisdictions which take the view that, although the words "permanent" or "permanently and continuously," standing alone, mean that the total disability must be a lasting one, yet when those words are considered in connection with the other language of the particular policy, they are to be construed as meaning that a disability that has existed continuously for the length of the testing period is a "permanent disability." . . .

Many of these . . . decisions are criticized in the former cases, on which we have relied as sustaining authority. . . . We simply say that we do not agree with them.

(Citations omitted.)

"permanent."[7] To accept Summers's policy interpretation would require that we ignore the clear language of the policy and the express requirement that Summers be "permanently" disabled. We cannot ignore the plain text of the policy and create an ambiguity that would further Summers's asserted purpose for purchasing the policy. *Weyerhaeuser Co.*, 142 Wn.2d at 666.

¶14 The policy language here is unambiguous. The policy contains a 12-month "waiting period" during which Great Southern was relieved of the necessity of investigating a premature or immature claim. *Richards*, 184 Wash. at 602-03. If, at the end of that period, Summers was "continuously Disabled," he would be entitled to the policy benefits. Being "disabled" required an inability to work as a commercial pilot for the remainder of Summers's life. Summers failed to show that his disability, i.e., the loss of his FAA medical certificate, was anything other than fleeting and temporary, and Great Southern was entitled to summary judgment on Summers's claim.

¶15 Summers seeks an award of attorney fees on appeal. But since we affirm the award of summary judgment, Summers is not the prevailing party and therefore is not entitled to attorney fees.

¶16 Affirmed.

HUNT and VAN DEREN, JJ., concur.

Reconsideration denied January 31, 2006.

Review denied at 157 Wn.2d 1025 (2006).

---

[7] The lack of support for Summers's argument is highlighted by the policy's payment schedule. If the policy had the purpose of providing a 30-month income replacement, then the policy's initial payment, occurring at the end of the 12-month "waiting period," should be for 12 months of Summers's expected salary, with 18 monthly installments equivalent to Summers's monthly salary to follow. But the policy does not contain such a payment structure; it merely provides for 18 monthly payments which, in sum, are close to Summers's salary for 30 months.